IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger

Civil Action No. 17-cv-02984-MSK-KMT

**OCEANSIDE TEN HOLDINGS.COM, LLC, and
MARKETONCE.COM, LLC,**

    Plaintiffs,

v.

**MKTG, INC.,
SAMPLE SOLUTIONS, LLC, and
STEVEN H. GITTELMAN,**

    Defendants.

---

**OPINION AND ORDER GRANTING MOTION TO TRANSFER**

---

**THIS MATTER** comes before the Court pursuant to the Defendants' Motion to Transfer Venue **(# 30)**, the Plaintiffs' response **(# 35)**, and the Defendants' reply **(# 40)**. Also pending is the Defendants' Motion to Stay **(# 31)** proceedings pending a ruling on the Motion to Transfer, which is denied as moot as a result of this Order.

## FACTS

According to the Complaint **(# 1)**, the Plaintiffs are businesses involved in conducting market research. Defendants Mktg, Inc. and Sample Solutions, LLC (collectively, "Sample") are involved in the same business and have devised software that assists in performing market research.

In 2016, the parties began discussing the Plaintiffs purchasing the rights to market research software owned by Sample, known as "ISIS" and "Crop Duster" ("the Software"). The

1

Plaintiffs intended to modify the Software somewhat before reselling it, and emphasized to Sample that, as part of the sale, they would require access to Raymond Nicoletti, a Sample employee and the Software's author, for assistance in making the modifications. Sample, through Defendant Gittelman, its officer, promised to make Mr. Nicoletti available to the Plaintiffs: he would remain a nominal employee of Sample, but would spend 3/4 of his work time on the Plaintiffs' projects, with the Plaintiffs paying 3/4 of his salary. The parties also agreed that this arrangement would not violate an agreement between them not to solicit each others' employees. However, the Plaintiffs contend that, despite these promises, Mr. Gittelman never had any intention of making Mr. Nicoletti available to the Plaintiffs.

The parties formalized and executed a written agreement for the sale of the Software (the "software sales agreement") in April 2017, although it is important to note that the agreement does not contain any provisions regarding Mr. Nicoletti and that it contains an integration clause excluding any parol agreements. Almost immediately thereafter, the Defendants "delayed in fulfilling their obligations under that agreement," such as delaying the handoff of the Software itself for a period of several months and failing to provide additional data that was included in the Plaintiffs' purchase of the Software. The parties apparently resolved these disputes eventually, but the Plaintiffs contend that the Defendants continued to withhold the services of Mr. Nicoletti.

In October 2017, Mr. Nicoletti resigned from employment with Sample, stating that he wanted to "follow the code" and joined the Plaintiffs to continue working on the Software. However, in November 2017, Sample's counsel wrote to Mr. Nicoletti, threatening to sue him if he continued to work for the Plaintiffs. Fearing the cost and risk of litigation, Mr. Nicoletti

tendered his resignation to the Plaintiffs. Mr. Nicoletti's resignation caused delay in the Plaintiffs' intended sale of the modified Software, causing the Plaintiffs to suffer business losses.

Based on these allegations, the Complaint alleges five claims against the Defendants, all sounding in tort: (i) "fraudulent inducement" against all Defendants, in that the Defendants induced the Plaintiffs to purchase the Software by falsely representing their intention to make Mr. Nicoletti available to the Plaintiffs; (ii) tortious interference with contract against all Defendants, in that the Defendants wrongfully interfered with the Plaintiffs' employment contract with Mr. Nicoletti; (iii) tortious interference with prospective relations against all Defendants, in that the Defendants' actions prevented the Plaintiffs from completing their modifications to the Software so that it could be marketed to the Plaintiffs' customers as anticipated; (iv) unjust enrichment against all Defendants in that the "Defendants received numerous benefits ranging from consideration under the software sales agreement, to decreased compensation from the Plaintiffs, to resultant increases profits for Defendants," all at the Plaintiffs' expense; and (v) promissory estoppel against all Defendants, in that the Plaintiffs detrimentally relied upon the Defendants' representations about making Mr. Nicoletti available when deciding to purchase the Software.

In the instant motion, the Defendants move **(# 30)** to transfer this action to a court in New York State, consistent with a forum-selection clause included in the software sales agreement. That clause provides that "any judicial action or proceeding arising hereunder or relating hereto shall be brought in . . . the state or federal courts of Suffolk County, State of New York." In response, the Plaintiffs contend that the forum selection clause does not apply to the claims asserted herein, because those claims do not "arise under or relate to" the software sales agreement itself.

3

## ANALYSIS

A forum selection clause that states that a case "shall be" brought in a certain location is a mandatory one. *American Soda, LLP v. U.S. Filter Wastewater Group, Inc.*, 428 F.3d 921, 927 n. 4 (10th Cir. 2005). Court will enforce a mandatory forum selection clause unless the party challenging it "clearly shows that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Niemi v. Lasshoffer*, 770 F.3d 1331, 1351 (10th Cir. 2014), *citing M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972). The interpretation of a forum selection clause is governed by ordinary principles of contractual analysis. *Milk N' More, Inc. v. Beavert*, 963 F.2d 1342, 1345-46 (10th Cir. 1992).

Here, the parties' dispute concerns whether the Plaintiffs' claims in this case "arise under" or "relate to" the software sales agreement. The Plaintiffs argue that none of their claims "arise under" the software sales agreement because none of those claims allege a breach of any contractual provision within the agreement. The Plaintiffs further contend that, to "relate to" the sales agreement, their claims must "involve the same operative facts as a parallel breach of contract claim" in order to fall within the scope of the forum selection clause. *Citing Xantrex Tech, Inc. v. Advanced Energy Indus., Inc.*, 2008 WL 2185882 (D. Colo. May 23, 2008). In essence, the Plaintiffs contend that tort claims are governed by the forum selection clause only if a breach of contract claim could be (and perhaps is) brought on the same set of facts implicated by the tort claims.

The Plaintiffs' reading of *Xantrex* and other cases is too narrow; none stand for the proposition that <u>only</u> tort claims that duplicate or parallel a breach of contract claim "relate to" a contract for purposes of a forum selection claims. Rather, a tort claim "relates to" a contract if it is "connected by reason of an established or discoverable relation" between the tort and the

contract. *Huffington v. T.C. Group, LLC*, 637 F.3d 18, 21-22 (1st Cir. 2011). This is "broader than the concept of a causal connection." *Id.* In *Huffington*, the plaintiff contracted to purchase securities based on representations by a broker about the securities' risk profile. When the securities underperformed, the plaintiff sued the broker for misrepresentation (but, notably, not for breach of contract), alleging that the representations about the securities' risk were false. The broker invoked the forum selection clause in the securities sale agreement that required disputes "with respect to" the sales agreement to be litigated in another forum. After finding that "with respect to" is functionally-identical to the term "relating to," the First Circuit concluded that the misrepresentation claims related to the securities sale agreement because the misrepresentations in question "proximately caused the agreement." *Id.* at 22. As the court noted, "[e]ach cause of action Huffington asserted has as a prerequisite the loss that flowed from the agreement and acquisition." *Id.* Thus, the court found the contractual forum selection clause to apply to the plaintiff's tort claims, notwithstanding the absence of any breach of contract claim.

Accepting as true that the false promises by Mr. Gittelman about making Mr. Nicoletti available to the Plaintiffs were not incorporated into the actual software sales agreement -- much like the misrepresentations about the risk profile of the securities in *Huffington* were not incorporated into the securities sales agreement – the injury that underlies the Plaintiffs' tort claims nevertheless arises, inexorably and proximately, from the Plaintiffs' decision to purchase the Software, and the Plaintiffs' decision to purchase the software was predicated upon Mr. Gittelman's promise of access to Mr. Nicoletti. The Complaint repeatedly makes clear that the Plaintiffs insisted on access to Mr. Nicoletti as a condition of purchasing the Software, and would not have entered into the agreement if they had believed that the Defendants would <u>not</u> produce Mr. Nicoletti. *See Complaint*, ¶ 37 ("Plaintiffs made it abundantly clear to Defendants

5

that they would require Defendants' agreement to let Nicoletti work with Plaintiffs in relation to any potential purchase of the software"); ¶ 113, 116 (Plaintiffs "relied upon" the false statements "regarding Nicoletti working for Plaintiffs" when "entering into the software sales agreement"). Thus, as in *Huffington*, the tort claims here are sufficiently "relate[d] to" the software sales agreement, even if they do not assert any breach of contract claim connected to the terms of the agreement itself.

Here, there can be no dispute that the Plaintiffs' fraudulent inducement, unjust enrichment, and promissory estoppel claims all expressly refer to the Plaintiffs' entry into the software sales agreement as the mechanism by which the Plaintiffs were injured. *See Complaint*, ¶ 119, 135, 143. Thus, there can be no dispute that these claims "relate to" the agreement under *Huffington*, and thus, that they are within the scope of the forum selection clause. Accordingly, they must be litigated in New York.[1]

Admittedly, there is a colorable argument to be made that the Plaintiffs' remaining claims – tortious interference with contract and tortious interference with prospective business relations – are not governed by the forum selection clause. The mechanism of injury for these claims is not the software sale itself, but, rather, actions that the Defendants took after the sale was fully completed. Thus, these claims would not be governed by the forum selection clause. But neither party has addressed how they believe the Court should proceed if some of the Plaintiffs' claims

---

[1] The Defendants have requested that any claims subject to the forum selection clause be transferred to the United States District Court for the Eastern District of New York. The Plaintiffs' response brief does not take a position on whether they would prefer to litigate in that federal court, or whether they would instead avail themselves of the right to bring these claims in the New York State Supreme Court for Suffolk County. Because the Plaintiffs themselves chose a federal forum here, and because it appears that claims brought in the New York State courts might be subject to removal to federal court on diversity grounds in any event, this Court will direct the transfer of the claims to the federal court in New York.

are subject to the forum selection clause while others are not. The Court conceives of two possible approaches.

First, the Court could bifurcate the tortious interference claims, retaining jurisdiction over those two claims here in Colorado and transferring the remaining claims to the Eastern District of New York. But such an approach yields two lawsuits proceeding simultaneously, in two separate jurisdictions (nearly two thousand miles and two time zones apart), with identical parties and somewhat overlapping facts. As the Court explained in *Hill's Pet Products v. A.S. U., Inc.*, 808 F.Supp 774, 776-77 (D.Kan. 1992), such bifurcation "would not advance the goal of judicial economy" and that "simultaneous prosecution in two different courts relating to the same parties and issues leads to the wastefulness of time, energy, and money."

The other alternative is for the Court to, *sua sponte*, exercise its discretion to transfer the tortious interference claims to New York as well, pursuant to 28 U.S.C. § 1404(a). *See Nalls v. Coleman Low Federal Inst.*, 440 Fed.Appx. 704, 706 (11th Cir. 2011) ("A district court may *sua sponte* transfer a civil action to any other district where it might have been brought if doing so will be convenient for the parties and witnesses and serve the interest of justice").[2] Transfer of venue pursuant to 28 U.S.C. § 1404(a) is governed by consideration of several factors relating to each jurisdiction's access to evidence and witnesses, administrative congestion, local interests, and, significantly, the plaintiff's own choice of forum. *Atlantic Marine Const. Co. v. U.S. District Court,* 571 U.S. 49, 62 n. 6 (2013). Most of these factors are in equipoise for purposes of choosing between Colorado and New York as fora for the claims herein: although the

---

[2] *Nalls* points out that, before effecting a transfer pursuant to § 1404, the Court should give the parties an opportunity to be heard. Here, the Defendants' initial motion squarely addressed the various factors that courts weigh in deciding whether to transfer venue under § 1404, and thus, the Court finds that the parties have had the opportunity to be heard on those factors as part of the briefing herein.

7

Plaintiffs' principal place of business is Colorado, Defendants Gittelman and Mktg are located in New York, and the locus of evidence relating to the parties' dealings will likely be shared equally between the parties' respective locations. Both states have an interest in adjudicating claims by or against their residents, and the Court cannot say that one jurisdiction's courts are considerably more congested than the other's.

However, perhaps the most important figure in the Plaintiffs' tortious interference claims is Mr. Nicoletti himself, and the parties note (indirectly) that he does not reside in either Colorado or New York. Rather, he is a citizen of North Carolina. This fact alters the landscape somewhat. Again, recall that the Plaintiffs' tortious interference with contract claim alleges that the Defendants wrote threatening letters to Mr. Nicoletti in order to induce him to resign his employment with the Plaintiffs. The locus of those actions, then, is the Defendants' location in New York (where the letters were sent) and Mr. Nicoletti's residence in North Carolina (where the letters were received); Colorado is significant only insofar as the injury to the Plaintiffs from Mr. Nicoletti's resignation was felt there. Moreover, as the parties note, Mr. Nicoletti has filed his own lawsuit against Mr. Gittelman and Mktg in that state. The presence of yet another lawsuit in yet another jurisdiction only serves to exacerbate the inefficiencies of multiplying fora, and, in turn, underscores the desirability of corralling all of the various cases among these parties to as few jurisdictions as possible. Because, as noted above, some of the Plaintiffs' claims here <u>must</u> be brought in New York, and Mr. Nicoletti's claims are being heard in North Carolina, only the most profound of justifications would warrant adding a third forum, Colorado, to the mix.

The factor tipping most strongly in favor of lodging some claims here in Colorado is the fact that it is the Plaintiffs' chosen forum for this suit. Without diminishing the obvious reasons

why a party would desire to litigate in its own home state, this Court agrees with the reasoning of *Hill's Pet Products*: the undesirable inefficiencies of multi-jurisdiction litigation themselves may[3] outweigh the benefits of deferring to a plaintiff's chosen forum. 808 F.Supp. at 777. This is even more true here, where deferring to the Plaintiffs' desire to litigate in Colorado adds a <u>third</u> (not just second) jurisdiction to the litigation landscape. The Plaintiffs here have not alleged any unusual reasons why Colorado is an especially important forum for their tortious interference claims, and thus, the inefficiencies that accompany litigating in a third jurisdiction outweigh the deference given to the Plaintiffs' chosen forum.

Accordingly, the Court finds that, to the extent that the tortious interference claims are not governed by the forum selection clause, the analysis under 28 U.S.C. § 1404(a) nevertheless warrants the conclusion that those claims should be transferred to the Eastern District of New York along with the other claims in this case.

## **CONCLUSION**

For the foregoing reasons, the Court **GRANTS** the Defendants' Motion to Transfer (**# 30**). All claims in this action a **TRANSFERRED** to the United States District Court for the Eastern District of New York, Long Island Division, and the Clerk of the Court shall effectuate

---

[3] In many cases, the decision to transfer venue will be informed by the presence of parallel litigation in other jurisdictions. This Court is not suggesting that the inefficiencies of multi-jurisdiction litigation will <u>always</u> outweigh the plaintiff's choice of forum. There may very well be situations where the plaintiff's choice of forum is motivated by more than the ordinary incidences of residence and convenience, and in such situations, the plaintiff's reasons for choosing the forum might justify maintaining litigation in two or more places simultaneously. Here, however, the Plaintiffs' response to the motion does not discuss the § 1404 factors, much less purport to explain why unusual weight should be given to their choice to file this action in Colorado.

such transfer and thereafter close this case.  The Defendants' Motion for Stay **(# 31)** is **DENIED AS MOOT**.

Dated this 18th day of May, 2018.

**BY THE COURT:**

_____

Marcia S. Krieger
Chief United States District Judge